**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARL M. SECHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 03 C 6197 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| HARRIS STEEL COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carl M. Sechrist has filed a one-count complaint, alleging that his employer, Harris Steel Company, violated § 2615 of the Family and Medical Leave Act of 1993 ("FMLA") when it fired him after he took off several days from work in January 2001 to care for his father who was sick. Harris Steel has filed a motion for summary judgment, arguing that Sechrist failed to establish – either in January 2001 or now -- that his father's sickness was a "serious health condition" under the FMLA. For the reasons stated below, the motion is granted.

## FACTUAL BACKGROUND

Plaintiff's FMLA claim focuses solely on whether he was justified under the FMLA in taking off from work in January 2001. However, the parties in their briefs discuss plaintiff's employment history, including his alleged history of absenteeism, leading up to January 2001. Although these facts are irrelevant to the legal claim asserted by plaintiff, we will nonetheless briefly describe them as they provide context.

## Plaintiff's Employment History Leading Up To January 2001

Carl Sechrist began working at Harris Steel on March 2, 1997. A few weeks after he began working, he signed a statement acknowledging that he had received copies of the company's work rules, attendance policy, and FMLA policy. Several years later, on June 14, 1999, Sechrist once again signed a written acknowledgment that he received copies of the work rules, attendance policy, and FMLA policy.

According to Sechrist, sometime in either in December 1999 or January 2000, he told the plant manager (Scott Decker) that Sechrist's father was diagnosed with cancer, which he described as "lymphoma carcinoma." (Dep. at 23.) Sechrist further claims that Decker did not take this statement seriously as evidenced by his response, which was: "Your father should be fine. My brother had that when he was twenty." (*Id.* at 29.)[1]

According to the company, in 2000, Sechrist began having attendance problems and was disciplined under the company's attendance policy. This policy sets forth a point system in which an employee loses points for various types of absences – for example, an employee loses 4 points if he is absent without giving notice but only loses 3 points if he is absent with notice. (Def. Ex. C at 2.)[2] The policy further states that an employee will receive various punishments – including termination – if he receives a set amount of points in a certain time period. Relevant

---

[1]Decker denies that this conversation took place, but because this is a summary judgment motion brought by Harris Steel, we will accept plaintiff's version of the facts where there is a dispute.

[2]The policy also lists various exempted absences for which no points are deducted. These include pre-arranged vacation time, sick days, and "[a]bsence in accordance with the Family Leave Act." In addition, the policy provides that an employee may gain bonus points by having a good attendance record for a certain period of time.

-2-

here, an employee who has accumulated eight points within 120 days after receiving disciplinary time off will be terminated.

According to Harris Steel, in 2000, Sechrist violated this policy several times, thus placing him in danger of termination in January 2001 if he had any further unexcused absences. Specifically, Harris Steel asserts the following facts. On June 27, 2000, Harris Steel gave Sechrist a warning for excess absenteeism and placed him on probation for 90 days. The day after this probation period ended, Sechrist left early after working only a half a day. A few days later, he was entirely absent from work. He then missed time from work before an October 17, 2000 grievance hearing and then again after his grievance was denied. Thus, Sechrist had acquired eight points under the policy, which meant that he would be fired if he had any further unexcused absences within the 120 days following September 25, 2000.[3]

---

[3]In Sechrist's response to defendant's Rule 56.1 statement, he denied some but not all of these facts. However, these denials do not create an issue of material fact. First, as noted above, given that he has only challenged whether his January 2001 absences should have been excused as leave under the FMLA, it is irrelevant whether these earlier disciplinary measures were justified. Second, Sechrist did not deny the specific facts recited in the above paragraph, which is taken from defendant's Fact No. 10. In response to Fact No. 10, Sechrist stated only that he believes that the attendance policy wasn't being applied equally to him as it was to other unnamed individuals in the company. But he never denied that he was absent on the specific dates listed in Fact No. 10. Moreover, Fact No. 10 was based on employee warning records, which were attached as Exhibit D. In particular, the employee warning record for June 27, 2000, which describes absences that occurred from April to June 2000, was signed by Sechrist. Sechrist does not deny that his signature is valid. This document thus makes clear that Sechrist was aware that Harris Steel was unhappy with his attendance problems and that it had concluded that he had violated the attendance policy several times before January 2001. In short, he knew that he had little margin for error.

## **The January 2001 Absences**

Sechrist was scheduled to work on Friday, January 5, 2001. He says that the night before he received a telephone call from his father who "seemed quite nervous on the telephone" and who stated that he was "feeling dizzy, sweaty, weak, and scared." He says that the call was received sometime between 10 p.m. and 12 a.m. on January 4th. Sechrist further states that, because he knew that his father was suffering from a "serious health condition," he immediately drove to his father's home. He then tried to take his father to the hospital, but his father refused to go. Sechrist stayed with his father and "[j]ust cooled him off" and "tried to fan him a little bit." (Dep. 104.) He also "made sure that he had something cold to drink." (*Id.*) Eventually, his father calmed down. (*Id.*)

The next morning, at 6:00 a.m., Sechrist telephoned Harris Steel to let it know he would be absent from work that day. After two or three unanswered calls, Sechrist finally reached Bob Gilley and told him that Sechrist's father "was sick" and that he needed to speak with Decker (the plant manager) or Ivory Thompson (his immediate supervisor). Gilley said that neither of them were present. At around 7:15 a.m. Sechrist spoke to Thompson and told him that he would not be at work, stating once again that his "father was sick." Sechrist asked Thompson if he would let Decker know that Sechrist would not be coming in. (Dep. at 106.) According to Sechrist, Thompson then stated: "I don't think that's going to fly with Scott." (*Id.* at 106-07.)

That night Sechrist received a call from Decker who asked about the condition of Sechrist's father. Sechrist told Decker that his father "was sick." Sechrist claims that Decker

then told him that he was fired and that he should not report to work on Monday January 8, 2001.[4]

On January 10, 2001, plaintiff's father, Jeffrey Sechrist, faxed a letter to Decker, attempting to explain why his son missed work. This letter states:

> This is to confirm that my son Carl was asked to stay with me on Friday Jan 5, 2001, because I wasn't feeling well as my wife was out of town.
>
> As it turns out, I needed him for the following day as well. I am sorry if I caused Carl or your company any inconvenience.
>
> Should you have any questions, please feel free to call me.

(Def. Ex. J.) At the bottom of this letter, Sechrist's father listed two phone numbers – one was a home phone number and the other a work number. (*Id.*)

On January 10th, after receiving this letter, Harris Steel concluded that Sechrist's absence was not excused and fired him based on its attendance policy.

Thirty-one months later, on September 4, 2003, Sechrist filed this action, alleging that Harris violated the FMLA when it terminated him. In his original complaint, he asserted that his father had "terminal cancer." *See* Cmplt. ¶¶ 6, 7. Over a year later, however, he filed a motion to amend his complaint to delete these references to his father having terminal cancer. He explained that he had since learned that his father did not have cancer but instead had "another" qualifying serious health condition. The motion did not state what this other condition was. (11/29/04 Mot.)[5]

---

[4]Harris Steel denies this allegation.

[5]On April 22, 2005, this Court granted the motion to amend the complaint.

**ANALYSIS**

Harris Steel moves for summary judgment, arguing that Sechrist cannot show a violation of the FMLA. In addition, because it is undisputed that Sechrist filed this action beyond the normal two-year FMLA statute of limitations period but within the three-year period for willful violations, he must show that the alleged violation here was willful. *See* 29 U.S.C. § 2617(c)(2).

Under the FMLA, an eligible employee may take off 12 weeks of work in any 12-month period for one of four reasons. 29 U.S.C. § 2612(a)(1). Relevant to this case is the provision that allows an employee to take off work to care for a parent who has a "serious health condition" as defined by the FMLA. 29 U.S.C. § 2612(a)(1)(C).

The FMLA and its implementing regulations set forth a process of notice and verification in which both the employer and employee participate in determining whether an employee is entitled to take leave under the FMLA. This process is designed to help employees "take reasonable leave for medical reasons" while at the same time doing so in a way that "accommodates the legitimate interest of employers." 29 U.S.C. § 2601(b).

As interpreted by courts, this process requires that the employee first give "notice to the employer of the need for FMLA leave." 29 C.F.R. § 825.303; *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001). Once the employee has met this initial duty of notice, then the burden of moving the process forward effectively shifts back to the employer who may, but is not required to, ask the employee to provide a certification from the employee's health care provider. 29 U.S.C. § 2613.[6] The employer also at this point has some duty of "further inquiry."

---

[6] Section § 2613 uses the word "may" and thus the employer's right to ask for a certification is not mandatory. *See Rager v. Dade Behring, Inc.*, 210 F.3 776, 777 (7th Cir. 2000) (an employer "can, indeed, if he wants, dispense with the [certification] requirement

The FMLA regulations state, for example, that "[t]he employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c); *see also* 29 C.F.R. § 825.303(b) (once the employee provides notice, then the employer "will be expected to obtain any additional required information through informal means"). This process of notice and verification is designed, of course, to lead eventually to a determination of whether the employee's absence was justified under the FMLA.

Sechrist argues that his phone calls and his father's January 10th letter provided sufficient initial notice to Harris Steel that his absences *might* be excused under the FMLA, which in turn obligated Harris Steel to inquire further. He claims that Harris Steel violated this duty of inquiry by prematurely firing him before he could provide evidence that would affirmatively establish that his father's sickness met the FMLA definition. The gist of his argument is that Harris Steel short-circuited the process and didn't give him a chance to demonstrate that his father's condition was in fact serious.

Two larger questions are raised by this argument. The first is whether the parties fulfilled their respective duties under this process. That is, did Sechrist meet his initial duty of notice? If so, did Harris Steel fail to inquire further? The second one is whether Sechrist's father in fact was suffering from a serious health condition as defined by the FMLA. Sechrist focuses only on the first question, asserting as his sole argument that Harris Steel had a duty to inquire further.

---

altogether"). However, if the employer does decide to ask for a certification, it must give the employee at least fifteen days to provide the certification. *See* 29 C.F.R. § 825.305(b). Here, it is undisputed that Harris Steel never asked Sechrist for a certification. Therefore, Sechrist was not required to submit a certification.

His implicit assumption is that, if Harris Steel had inquired further, it would have been clear that his leave was justified under the FMLA. We will analyze both questions below.

**I.      Notice and The Duty To Inquire Further.**

What must an employee do to fulfill his initial duty of notice? The starting point for answering this question is the FMLA regulations, which state:

> The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g. spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.

29 C.F.R. § 825.303(b). As indicated by this statement, an employee is not required to show, in this initial act of notifying his employer, that he can meet all of the requirements for qualifying for FMLA leave.

Nevertheless, the employee is required to provide at least *some* information that would make his employer aware of the *possible* need for leave. This question is often fact specific, and courts in different jurisdictions have given different answers to the question of just how much information must be provided by the employee. Sechrist relies solely on a Michigan state appellate court decision and argues that the information communicated in his phone calls and in his father's January 10th letter provided sufficient information to put Harris Steel on notice of a possible FMLA claim. *See Woodman v. Miesel Sysco Food Service Co.*, 657 N.W.2d 122, 125-26, 131 (Mich. App. Ct. 2003) (finding that notice was sufficient when employee, who left work early due to chest pains, later told employer that he had to miss work because he went to the emergency room and had to wait for a stress test to be done to determine what was causing his chest pains).

-8-

We do not need to analyze here whether the employee's statement in *Woodman* that he needed time off to get a stress test for chest pains is factually analogous to plaintiff's statement that his father was "sick" because we are obligated to follow the law in this circuit. *See generally Hays v. United States*, 397 F.3d 564, 567 (7th Cir. 2005) ("Even if it is on point, a [decision from another circuit] is not binding on courts in [this] circuit[]."). And the law in this circuit is clear with regard to the factual situation at issue in this case. In *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1007-08 (7th Cir. 2001), the Seventh Circuit considered whether an employee who calls in and states only that she is "sick" has given her employer sufficient notice under the FMLA. The Seventh Circuit concluded that this statement was insufficient because telling your employer that you are sick "does not imply" that you have a serious health condition under the FMLA. *Id.* at 1008. The Seventh Circuit thus affirmed summary judgment in favor of the employer.

A number of courts have relied on *Collins* and have granted summary judgment to the employer where, as here, the employee merely said that he or she was "sick" or provided a similarly vague variation. *See, e.g., Hague v. Equistar Chemical Co.*, 2002 WL 1968390, *3 (N.D. Ill. Aug. 26, 2002) (employee's statement that he was "in pain from his tailbone" was insufficient notice based on *Collins* because employee did not "convey the severity of the condition or the nature of his medical problem"); *Kramarski v. Village of Orland Park*, 2002 WL 1827637, *18 (N.D. Ill. Aug. 9, 2002) (relying on *Collins* and holding that "calling in sick" was insufficient notice under the FMLA); *Levine v. Children's Museum of Indianapolis, Inc.*, 2002 WL 1800254, *8-9 (S.D. Ind. July 1, 2002) (employee's statement that he missed work because of an "illness" was not proper notice), *aff'd* 61 Fed. Appx. 298 (7th Cir. 2003) (unpublished

order); *Booth v. Roadway Express, Inc.*, 2005 WL 1705064, * 7 (S.D. Ohio July 21, 2005) (employee's statement that he was having "problems with [his] physical well-being" did not sufficiently alert employer about a possible FMLA claim); *see also Bell v. Jewel Food Store*, 83 F.Supp.2d 951, 957 (N.D. Ill. 2000) (decided before *Collins* but reaching same result: employee who "simply told [his employer] that he was sick and hurting" did not give sufficient notice).

Here, it is undisputed that Sechrist only told Harris Steel that his father was sick and did not provide any other information. In his own description of the events, as set forth in his statement of additional facts under Rule 56.1, Sechrist says that he told Gilley on the morning of January 5th that "his father was sick." Later that same day, he told Ivory Thompson that he would not be coming in to work that day because "his father was sick." That evening he told Decker that "his father was sick." Thus, by plaintiff's own admission, despite multiple conversations on the subject, all he told his employer was that his father was sick. He conveyed no other information.[7] His father's statement that he "wasn't feeling well" is similarly vague and fails to explain what was causing him to feel poorly or whether his bad feelings were serious or long-term in nature.

Sechrist believes that his statement to Decker a year before this incident, in which he claims that he told Decker that his father had cancer, makes this case different. Specifically, he believes that Harris Steel should have made a connection between these two statements, made a

---

[7]Plaintiff asserts that his father said to him on January 4th that he was "feeling dizzy, sweaty, weak, and scared." Sechrist has not indicated whether he communicated this additional information to Harris Steel at the time, but even assuming he did, these symptoms are so common as to provide little basis for determining whether plaintiff's father was serious. For example, "[m]ost cases of dizziness are minor, such as a bout of flu or a cold." *American Medical Association: Complete Medical Encyclopedia* 472 (Jerrold B. Leikin, MD & Martin S. Lipsky, MD eds. 2003) [hereinafter, *AMA Encyclopedia*].

year apart, and should have assumed that the sickness mentioned in January 2001 was related to his father's cancer.

We disagree. This same type of argument was made in *Collins*. The plaintiff there argued that, when she told her employer she was sick, her employer should have made a connection between that statement and one she made a year earlier in which she told her employer she suffered from depression. *Id.* at 1008. The Seventh Circuit rejected this argument and held that it was incumbent upon the plaintiff to link her current sickness to her long-term condition by specifically referring to that long-term condition. *Id.* at 1009 ("A reference to being 'sick' not only withheld important information from the employer but likely threw it off the scent."); *see also Levine*, 2002 WL 1800254 at *2, 9 (rejecting the argument that, because plaintiff a year earlier told his supervisor, the director of human resources, and two other employees that he had a recurring long-term condition, his employer should have known that plaintiff's current "illness" was caused by that long-term condition).

Likewise here, plaintiff made no effort, as he easily could have done in one of his several phone calls, to inform Harris Steel that he believed that his father's current sickness was caused by his cancer. Using the term "sickness" to indirectly refer to cancer is not clear or common. Elsewhere in his brief, when plaintiff refers to his father's long-term condition, he uses the term "fatal disease" – a term with far different connotations from either "sickness" or "not feeling well."[8]

---

[8]It is undisputed that Harris Steel had twice informed Sechrist about the FMLA and the company's attendance policy. Moreover, plaintiff knew on the morning of January 5th that Harris Steel would need more concrete information than simply the assertion that plaintiff's father was sick. Gilley specifically told him that Decker would not be happy with such a statement. Plaintiff was thus aware that he needed to come forward with more specific

In sum, based on *Collins*, we find that Sechrist has failed to establish a genuine issue of material fact sufficient to show that he met his duty to give notice. Harris Steel thus had no duty to inquire further.

## II.     Did Sechrist's Father Have A Serious Health Condition?

Even if we had concluded that Sechrist put Harris Steel on notice, we still would find that summary judgment should be granted because plaintiff has not shown (or even tried to show) that his father had a "serious health condition." Instead, he apparently believes that he can prevail if he merely shows that Harris Steel failed to further inquire into the issue. We disagree. Sechrist has not cited to any cases in which a plaintiff prevailed on an FMLA claim simply by showing that his employer breached the duty of inquiry without showing that the failure to inquire further resulted in prejudice. *Cf. Bell v. Jewel Food Store*, 83 F.Supp.2d at 957 (holding that it was "irrelevant" whether employer should have inquired further because the plaintiff could not show he qualified for FMLA leave). As set forth below, even if Harris Steel had made further inquiries in January 2001, the result would have been the same.

A serious health condition is defined in the statute as either inpatient care in a hospital (or similar facility) or continuing treatment by a health care provider. 29 U.S.C. § 2611(11). The regulations set forth more specific definitions and various ways a plaintiff can show that he or a family member has a serious health condition. 29 C.F.R. § 825.114 ("What is a 'serious health condition' entitle an employee to FMLA leave?"). For example, a serious health condition "includes an illness resulting in more than three days of incapacity and requiring treatment at least two times by a health-care provider." *Kauffman v. Federal Express Corp.*, 426 F.3d 880,

---

information than he did.

886 (7th Cir. Oct. 18, 2005) (citing 29 C.F.R. § 825.114(a)(2)(i)(A)). There is also a provision for incapacity due to a "chronic serious health condition" and for a "period of capacity which is permanent or long-term due to a condition for which treatment may not be effective." 29 C.F.R. § 825.114(a)(2)(iii) & (iv). Examples of the latter type of incapacity include "Alzheimer's, a severe stroke, or the terminal stages of a disease." *Id.*

Sechrist has not attempted to show that his father's illness qualified under any of these tests. He does not argue that his father was incapacitated for three days or try to establish that his father saw a health-care provider two times in this general time period. In fact, when Sechrist asked his father if he wanted to go to the emergency room on January 4th, his father said that he did not need to go, thus suggesting that he did not receive treatment from a health-care provider.

Sechrist also has not bothered to submit any medical evidence that would explain the nature and severity of his father's condition. The failure to submit such evidence has generally been held to prevent a plaintiff from recovering. As the district court stated in *Levine*, a "plaintiff's own statement is insufficient to establish incapacity under the FMLA." 2002 WL 1800254, at *6 (collecting cases); *see also Haefling v. United Parcel Service*, 269 F.3d 494, 500 (7th Cir. 1999) (affirming summary judgment to employer: "Haefling did not submit an affidavit from his own doctor or any other medical personnel demonstrating the necessity of the 'treatments' he supposedly received, and Haefling's own self-serving assertions regarding the severity of his medical condition and the treatment it required are insufficient to raise an issue of fact[.]"); *Bell*, 83 F.Supp.2d at 959 ("Bell's own statement is not enough to establish [that] he

was incapacitated: Bell must provide evidence from a medical professional or health care provider that he was unable to work.").

This is not simply a case where we lack certain details about a person's health condition. We do not even know *the name of* the long-term ailment that plaintiff's father allegedly suffers from. All we know, and all that plaintiff has been willing to say, is that *he believes* that his father's condition is "fatal" or "terminal" and that it has symptoms similar to those of cancer.

Plaintiff's unwillingness to come forward with any information about his father's condition makes it impossible to assess whether his illness met the FMLA requirements. As an initial matter, we cannot even be sure that plaintiff's father in fact had a serious or potentially fatal long-term disease. There is no independent evidence to verify this assertion. Plaintiff has already admitted that his previous belief that his father had cancer was wrong.

But even if we could take it as true that plaintiff's father did have cancer or some other similar condition, this still would not obviate the need to provide *some* additional documentation and explanation. For example, if we assume (as plaintiff originally indicated) that his father had cancer in January 2001, we still would not know what type of cancer he had, what stage the cancer was at, or whether he was currently being treated for it. There are hundreds of types of cancer with varying degrees of seriousness. A diagnosis of cancer does not necessarily mean that a person has a fatal disease. *See generally AMA Encyclopedia* at pp.308-10 ("Half of all men and a third of all women in the United States will develop cancer at some point. [] Today, millions of people are living with cancer or have been cured of the disease. Based on normal life expectancy, the chance of surviving for at least 5 years with cancer is 50 percent.").

Even if we made a further assumption that Sechrist's father had a type of cancer that probably would *eventually* be fatal, we still would face the question whether his "sickness" in January 2001 had anything to do with that cancer. Many people who eventually die from cancer are fortunately able to work and lead active and largely pain-free lives for many years before they enter the terminal stages of their disease.[9] During this time, these individuals no doubt catch colds, get the flu, and suffer from a number of minor ailments which people without cancer also suffer from and which are ordinarily not considered grounds for leave under the FMLA.[10] The key point here is that plaintiff has provided no information from which this Court or a jury could make any determination as to whether plaintiff's father's illness was serious.

Moreover, based on the few facts that are available, there is doubt as to whether the January 2001 illness of plaintiff's father was serious or was connected to his alleged long-term condition. First, his father chose to describe his illness merely as an instance of "not feeling well." As explained above, this is not a phrase that you would expect a person to use who was suffering from the effects of a fatal disease. Second, his father saw no need to go to the hospital or even, insofar as we know, to a doctor. Third, his father said that Harris Steel could call him at his work phone number, which means that he was working at the time and expected to be back at work soon. Fourth, his father's wife left town without getting anyone to stay with him, suggesting that she did not think his condition was serious. Fifth, in his March 11, 2005

---

[9] As noted above, section 825.114(a)(iv) refers to incapacity due to a long-term or permanent condition. It specifically refers to the "terminal stages" of a disease. *Id.*

[10] *See generally Levine*, 2002 WL 1800254 at *10 (noting that the FMLA "was not intended to mandate, as a matter of federal law, a uniform national sick leave policy for minor or temporary illnesses and discomforts").

deposition, Sechrist testified that his father was still living. (Dep. At 6.) This means that his father lived at least four years beyond this incident.

In sum, plaintiff has simply not provided any information about his father's condition and has not even explained the *basis for* his own belief that this condition was serious.[11] His "take my word for it" approach is not consistent with the structure and purpose behind the FMLA. His principal contention in this lawsuit has been that Harris Steel prematurely fired him in January 2001 just as he was about to offer proof that his father did have a serious health contention. But this contention is not credible given that now, with the aid of counsel and the availability of discovery, he still has not come forward with any such proof. Given his failure to come forward with any concrete information, either then or now, he has not created a genuine issue of material fact that his leave was justified under the FMLA, much less shown that Harris Steel's decision at the time was a willful violation of the FMLA, which he must do to avoid the statute of limitations.

---

[11]Although Sechrist offers no explanation whatsoever in his response brief for why he did not come forward with *any* evidence showing that his father had a serious health condition, his counsel stated in the reply brief to the motion to amend the complaint that he was not able to reveal what condition Sechrist's father suffered from because counsel was not "at liberty to disclose such a private matter of another individual." (1/07/05 Reply Brief at 5.) Counsel then speculated that Sechrist's father may have been embarrassed by his particular disease. Aside from the fact that there is no admissible evidence supporting counsel's speculations, we are not aware of any case or other authority that holds that a party is relieved from his normal burden of proof under the FMLA if his lawyer asserts that the family member might be embarrassed about revealing the name of his ailment.

## **CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is granted, and judgment is granted to the defendant on all remaining counts. This concludes this lawsuit.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** November 30, 2005